# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| CENTENE CORPORATION and HEALTH NET, LLC, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) C.A. No. 2021-0206-PAF ) |
| ACCELLION, INC., | ) ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION

Date Submitted: November 1, 2021
Date Decided: March 29, 2022

Paul J. Lockwood, Ryan M. Lindsay, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; William E. Ridgway, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Chicago, Illinois; Peter B. Morrison, Zachary M. Faigen, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Los Angeles, California; *Attorneys for Plaintiffs Centene Corporation and Health Net, LLC*.

Raymond J. DiCamillo, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Michael Rubin, Melanie Blunschi, LATHAM & WATKINS LLP, San Francisco, California; Serrin Turner, LATHAM & WATKINS LLP, New York, New York; *Attorneys for Defendant Accellion, Inc.*

**FIORAVANTI, Vice Chancellor**

A healthcare company and its subsidiary seek to keep their breach of contract action in this court. Their contract counterparty insists this suit belongs in California. The plaintiffs, Centene Corporation ("Centene") and Health Net, LLC ("Health Net," and with Centene, "Plaintiffs"), and defendant, Accellion, Inc. ("Accellion"), are parties to a license agreement, pursuant to which Plaintiffs have licensed Accellion's software. The license agreement is governed by California law and selects three counties in California as the forum for any dispute regarding the license agreement. Years after entering into the license agreement, Plaintiffs informed Accellion that Plaintiffs would not renew the license agreement unless Accellion entered into an ancillary agreement designed to protect private health information in accordance with federal law. The parties entered into the ancillary agreement, which contains neither a choice of law nor choice of forum provision. In 2021, Accellion experienced a data breach that exposed personal health information of plaintiffs' clients. Plaintiffs sought to invoke their rights under the ancillary agreement. When Accellion refused to comply, Plaintiffs filed a complaint in this court asserting claims for breach of contract and seeking declaratory relief solely as to the ancillary agreement. Accellion has moved to dismiss, arguing that the forum selection clause in the license agreement mandates that this dispute be litigated in California. Plaintiffs argue that the license agreement is inapplicable to this dispute because the claims asserted here only relate to the ancillary agreement, which is a

fully integrated agreement that supersedes the license agreement. This opinion grants Accellion's motion.

## I.    BACKGROUND

The facts recited in this Memorandum Opinion are drawn from the Verified Complaint, documents integral thereto, and materials submitted by the parties.

### A.    The Parties

Centene is a Delaware corporation with its principal place of business in St. Louis, Missouri.[1]  Health Net is a health insurance company and has been a wholly owned subsidiary of Centene since March 2016.[2]

Accellion (or "Defendant") is a Delaware corporation that provides data storage, maintenance, and transfer solutions for its clients, with its principal place of business in Palo Alto, California.[3]

### B.    The Parties' Contracts

#### 1.    The License Agreement

Accellion offers cloud-based, file-transfer services through a file transfer system known as the File Transfer Appliance (the "FTA").[4]  Accellion marketed the

---

[1] Dkt. 1, Verified Complaint ("Compl.") ¶ 9.

[2] *Id.* ¶¶ 1, 10.

[3] *Id.* ¶¶ 2, 11.

[4] *Id.* ¶¶ 4, 14.

FTA as a solution for companies that needed to "transfer large and sensitive files securely" and as a means for those companies to protect their customers' Protected Health Information ("PHI") and to comply with the requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").[5] Under HIPAA, PHI is defined as "individually identifiable health information . . . that is: (i) Transmitted by electronic media; (ii) Maintained in electronic media; or (iii) Transmitted or maintained in any other form or medium."[6] Health Net first contracted with Accellion to use the FTA in 2010.[7] Health Net subsequently used the FTA to communicate with health care providers regarding patients and their PHI.[8]

On August 2, 2012, Health Net and Accellion entered into a License Agreement (the "License Agreement"), which provided Health Net with continued access to Accellion's software, including the FTA.[9] The License Agreement also addresses each party's liability risk. The section describing Accellion's limited warranties reads:

---

[5] *Id.* ¶ 14; *see* 42 U.S.C. § 1320d *et seq.*

[6] 45 C.F.R. § 160.103.

[7] Compl. ¶ 17.

[8] *See id.* ¶¶ 15–16.

[9] *See* Dkt. 6, Accellion, Inc.'s Opening Brief in Support of its Motion to Dismiss the Verified Complaint ("Def.'s Op. Br."), Ex. 1 ("License Agreement").

Accellion is not liable under any warranty or otherwise for defects or liability caused by the use of the [Accellion's software] . . . in any manner or for any purpose other than that for which it was licensed to Customer, or for causes not within Accellion's reasonable control. . . .

ACCELLION DOES NOT WARRANT THAT THE USE OF [its software] WILL BE UNINTERUPPTED OR ERROR FREE.[10]

Under the terms of the License Agreement, Accellion also agrees to indemnify Health Net in a third-party action "to the extent that it is based upon a claim that [Accellion's software] . . . infringes such third-party's U.S. patent or foreign equivalent thereof . . . or misappropriates any trade secret . . . ."[11] And under a section titled, "Limitation of Liability," the License Agreement states:

EXCEPT FOR THE INDEMNIFICATION OBLIGATIONS HEREIN [and other exceptions] . . . , IN NO EVENT SHALL EITHER PARTY . . . BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOSS OF PROFITS, REVENUE, DATA OR USE ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE USE OR PERFORMANCE OF THE PRODUCTS OR SERVICES SUPPLIED HEREUNDER . . . ACCELLION'S AGGREGATE LIABILITY FOR DAMAGES SHALL IN NO EVENT EXCEED THE TOTAL FEES RECEIVED FROM THE LICENSES GRANTED TO THE CUSTOMER UNDER THIS AGREEMENT IN THE PREVIOUS TWELVE MONTHS FOR THE APPLICABLE [software].[12]

---

[10] License Agreement §§ 8.1(b), 8.4.

[11] *Id.* § 9.2.

[12] *Id.* § 10.

The License Agreement also contains a forum selection clause (the "Forum Selection Clause"), stating that "[a]ny dispute between the parties regarding this Agreement will be subject to the exclusive venue of the state and federal courts in the state of California in San Francisco, San Mateo and Santa Clara counties."[13] Additionally, the License Agreement contains an integration clause, which reads in pertinent part: "This Agreement constitutes the complete and exclusive agreement between the parties and supersedes any and all prior communications, representations and understandings, whether written or oral."[14]

The License Agreement contemplates that the duration of the agreement will be set forth in an "Order" for Accellion's services, which Order becomes part of the License Agreement.[15] The License Agreement provides that it "shall continue for the License Term on the applicable Order" unless otherwise terminated by the parties.[16] Neither the License Term nor the applicable Order is in the record.

### 2. The BAA

HIPAA regulations require companies like Health Net to obtain contractual assurances from companies they engage to safeguard PHI.[17] In January 2015, Health

---

[13] *Id.* § 12.7.

[14] *Id.* § 12.10.

[15] *Id.* §§ 1.2, 11.1.

[16] License Agreement § 11.1.

[17] *See* 45 C.F.R. §§ 164.502(e)(2), 164.504(e).

Net informed Accellion that Health Net's renewal of the License Agreement would be contingent on the parties entering into a business associate agreement (the "BAA").[18] The BAA was meant to ensure Health Net's compliance with the pertinent HIPAA regulations.[19] After nearly two months of negotiations, Health Net and Accellion executed the BAA on March 19, 2015.[20]

The BAA obligates Accellion to "use appropriate administrative, physical, and technical safeguards to prevent improper use or disclosure of PHI,"[21] so as to comply with HIPAA and other security and privacy requirements. Those requirements are detailed in a schedule attached to the BAA.[22] The BAA also states that Accellion "shall be responsible for all costs incurred in connection with the loss [of PHI], Security Incident or Breach, including but not limited to, any notifications and mitigation activities taken."[23]

---

[18] Compl. ¶¶ 18–19. *See generally* Gerald E. DeLoss, *HIPAA Requirements for Lawyers-Business Associate Contracts*, 79 N.D. L. REV. 41, 46–48 (2003) (describing HIPAA's requirements for business associate contracts).

[19] Compl. ¶ 18.

[20] *Id.* ¶¶ 19–20.

[21] Compl., Ex. A ("BAA") § II(d). The BAA incorporates HIPAA's definition for PHI. *Id.*, Recital C.

[22] *See id.*, Schedule B.

[23] *Id.* § II(g). The BAA adopts HIPAA's definitions for both a "Breach" and a "Security Incident." *Id.* §§ I(a), (s). A "Breach" is defined as "the acquisition, access, use, or disclosure of protected health information in a manner not permitted under" ancillary HIPAA regulations. 45 C.F.R. § 164.402. A "Security Incident" is defined as the

Like the License Agreement, the BAA contains an indemnification provision, albeit one where Accellion accepts more liability. Under the BAA, Accellion:

> shall defend, indemnify and hold harmless Health Net . . . from and against any claim, cause of action, liability, damage, cost or expense (including reasonably attorneys' fees) arising out of or relating to any loss, Security Incident, Breach or other non-permitted use or disclosure of PHI, failure to safeguard ePHI, or other breach of this Agreement by [Accellion] . . . . The exclusions and limits of liability, if any, provided in the Health Net - Vendor Contract(s) shall not apply in the event of a breach of [the BAA] or with respect to [Accellion's] indemnification obligations.[24]

The BAA defines "Health Net - Vendor Contract(s)" to encompass two categories of contracts: (1) a "contract or contracts for the provision of services, software or some other business arrangement" that Health Net and Accellion executed "[o]n or around the date" the BAA was signed "or shortly thereafter" and (2) "additional agreements in the future pursuant to which [Accellion] may provide services to Health Net, license software to Health Net or enter into some other business arrangement."[25]

The BAA also provides Health Net with information rights. Under the BAA, Health Net "may inspect the facilities, systems, records, policies and procedures

---

attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system." 45 C.F.R. § 164.304.

[24] BAA § II(q).

[25] *Id.*, Recitals A–C.

relating to the access, use and/or disclosure of PHI or ePHI pursuant to [the BAA] for the purpose of determining whether [Accellion] has complied with [the BAA]," subject to Health Net giving Accellion written notice ten business days in advance (the "Audit Provision").[26]

Like the License Agreement, the BAA contains its own integration clause (the "Integration Clause"):

> This Agreement—consisting of the signature page, these terms and conditions and the attached Schedules and Addenda—constitute the entire agreement between the Parties with respect to its subject matter and merges, integrates and supersedes all prior and contemporaneous agreements, addenda and understandings between the Parties, whether written (including within any Health Net-Vendor Contract(s)) or oral, concerning its subject matter. Schedules A and B to this Agreement, attached hereto, are incorporated herein as though fully set forth in the body of the Agreement.[27]

Unlike the License Agreement, the BAA contains neither a forum selection provision nor a choice of law provision. According to Accellion, the BAA is "a form agreement that Centene appears to have had its vendors sign in 2015," but it acknowledges that the parties negotiated over its terms for approximately two months.[28]

---

[26] *Id.* § IV.

[27] *Id.* § X.

[28] Dkt. 14 ("Hrg.") at 5:11–17; *see* Compl. ¶ 19.

Centene acquired Health Net on March 24, 2016.[29] Following the acquisition, Centene began administering the contracting relationship between Health Net and Accellion, to which Accellion agreed.[30]

## C. The FTA Is Hacked and PHI Is Exposed

On December 16, 2020, Accellion discovered vulnerabilities in the FTA, which allowed for hackers remotely to access customer data.[31] Accellion notified Centene about these vulnerabilities on December 21, but omitted any mention of customer data being stolen.[32] On January 12, 2021, Accellion issued a press release acknowledging that "it was made aware" of a "vulnerability" in the FTA in mid-December, but also stated that it had resolved the vulnerability.[33] The press release did not disclose that customer data had been stolen.[34]

On January 20, 2021, hackers exploited vulnerabilities in the FTA again.[35] This time the hackers remotely accessed customer data, including data that belonged to Plaintiffs' customers (the "Data Breach").[36] On January 22, 2021, Accellion's

---

[29] Compl. ¶ 26.

[30] *Id.* ¶ 27.

[31] *Id.* ¶ 30.

[32] *Id.* ¶ 31.

[33] *Id.* ¶ 33.

[34] *Id.*

[35] *Id.* ¶ 35.

[36] *Id.*

Chief Information Security Officer alerted Plaintiffs that Accellion had discovered the second security vulnerability in the FTA and that it was an "extension" of the previously disclosed vulnerability.[37]

On February 11, 2021, Plaintiffs' counsel notified Accellion that Plaintiffs intended to audit Accellion's compliance with the BAA pursuant to the terms of the Audit Provision.[38] Plaintiffs also demanded that Accellion indemnify Plaintiffs and "bear responsibility for" all past and future costs resulting from the Data Breach.[39] Accellion refused to indemnify or bear responsibility for Plaintiffs costs or provide them access for an audit.[40]

### D.    Procedural History

Plaintiffs filed their three-count Verified Complaint (the "Complaint") on March 10, 2021.[41] Count I seeks an order directing Defendant's specific performance and compliance with the BAA's Audit Provision.[42] Count II seeks a declaratory judgment that Accellion must indemnify Plaintiffs under the BAA for

---

[37] *Id.* ¶ 36.

[38] *Id.* ¶ 38.

[39] *Id.*

[40] *Id.* ¶ 39.

[41] *See* Dkt. 1.

[42] Compl. ¶ 47.

damages they suffered relating to their losses from the Data Breach.[43]  Count III

alleges that Accellion breached the BAA by (1) "failing to maintain reasonable

security and safeguards to prevent unauthorized access to PHI" in accordance with

the BAA, (2) refusing to "bear responsibility" for Plaintiffs' costs resulting from the

Data Breach, and (3) refusing to indemnify Plaintiffs from the fallout over the Data

Breach.[44]

Accellion has moved to dismiss the Complaint under Court of Chancery Rule

12(b)(3), arguing that the License Agreement's Forum Selection Clause precluded

Plaintiffs from bringing their claims in this court.[45]

## II.   ANALYSIS

"The proper procedural rubric for addressing a motion to dismiss based on a

forum selection clause is found under Rule 12(b)(3), improper venue." *In re Bay

Hills Emerging P'rs I, L.P.*, 2018 WL 3217650, at *4 (Del. Ch. July 2, 2018)

---

[43] *Id.* ¶¶ 48–55.

[44] *Id.* ¶ 59.

[45] *See* Dkt. 3.  Defendant initially moved to dismiss under Court of Chancery Rule 12(b)(6) as well, but failed to make any arguments for dismissal under that rule in its briefing. "Under the briefing rules, a party is obliged in its motion and opening brief to set forth all of the grounds, authorities and arguments supporting its motion." *Franklin Balance Sheet Inv. Fund v. Crowley*, 2006 WL 3095952, at *4 (Del. Ch. Oct. 19, 2006) (citing Ct. Ch. R. 7(b) and 171).  "The failure to raise a legal issue in an opening brief generally constitutes a waiver of the ability to raise that issue in connection with a matter under submission to the court." *Thor Merritt Square, LLC v. Bayview Malls LLC*, 2010 WL 972776, at *5 (Del. Ch. Mar. 5, 2010).  Therefore, I consider that part of its motion waived.

(internal quotations omitted). "Delaware honors contractual choice of forum provisions." *PPF Safeguard, LLC v. BCR Safeguard Hldg., LLC*, 2010 WL 2977392, at \*5 (Del. Ch. July 29, 2010). "Forum selection clauses are presumptively valid and should be specifically enforced unless the resisting party clearly shows that enforcement would be unreasonable and unjust, or that the clause is invalid for such reasons as fraud and overreaching." *Ingres Corp. v. CA, Inc.*, 8 A.3d 1143, 1146 (Del. 2010) (internal quotations and bracketing omitted). Consequently, under Court of Chancery rule 12(b)(3), the court will grant a motion to dismiss for improper venue if there is an applicable forum selection clause where the parties use "express language clearly indicating" that they may not bring an action in this court. *Ashall Homes Ltd. v. ROK Ent. Grp. Inc.*, 992 A.2d 1239, 1245 (Del. Ch. 2010) (internal quotations omitted). Unlike a motion to dismiss for failure to state a claim, "the court is not shackled to the plaintiff's complaint and is permitted to consider extrinsic evidence from the outset." *Mack v. Rev Worldwide, Inc.*, 2020 WL 7774604, at \*6 (Del. Ch. Dec. 30, 2020).

Accellion contends that this dispute implicates the License Agreement's Forum Selection Clause, and therefore, Plaintiffs' claims may only be brought in one of the three California counties specified in the License Agreement. Plaintiffs do not challenge the validity of the Forum Selection Clause. Instead, they argue that this dispute does not implicate the Forum Selection Clause in the License

12

Agreement. Plaintiffs assert that their claims fall solely under the BAA, which was a subsequent, fully integrated agreement that created distinct rights, obligations, and remedies. Because the BAA contains no forum selection clause of its own, Plaintiffs maintain that the License Agreement is inapplicable.

The parties do not dispute that if the Forum Selection Clause applies to the Plaintiffs' Complaint, Defendant's motion must be granted. Thus, the issue here concerns the extent of the Forum Selection Clause in the License Agreement as to the current dispute. Accellion essentially makes two arguments in support of its position: (1) the scope of the Forum Selection Clause encompasses Plaintiffs' causes of action and Accellion's defense to the claims; and (2) Plaintiffs' own allegations in the Complaint state that the BAA is part of the License Agreement, and the Forum Selection Clause thus applies to any claims rooted in the BAA. Plaintiffs rely on the Integration Clause in the later-executed BAA, which contains no choice-of-forum provision, as foreclosing Accellion's arguments.

### A.    The Scope of the Two Agreements

Determining the scope of both the License Agreement and BAA requires the court to engage in contract interpretation. The License Agreement is governed by California law. The BAA is silent as to which law applies.

In Delaware, the construction of contract language presents a question of law. *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195

13

(Del. 1992). The court's "task is to fulfill the parties' shared expectations at the time they contracted." *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 696 (Del. 2019) (internal quotations omitted). The court starts with the text of the contract. *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019). When a contract's language is clear and unambiguous, the court will give effect to the plain meaning of the contract's terms and provisions. *Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010). The contract is to be read as a whole, giving effect to each term and provision, "so as not to render any part of the contract mere surplusage." *Id.* at 1159.

California rules governing contract interpretation are similar. *See Grunstein v. Silva*, 2011 WL 378782, at *13 (Del. Ch. Jan. 31, 2011); *see also KT4 Partners LLC v. Palantir Techs. Inc.*, 2021 WL 2823567, at *18 (Del. Super. Ct. June 24, 2021) ("Both Delaware and California courts take a plain meaning approach to contract interpretation."). Under California law, "[t]he language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." Cal. Civ. Code § 1638; *Powerine Oil Co. v. Superior Ct.*, 118 P.3d 589, 598 (Cal. 2005) ("If contractual language is clear and explicit, it governs.") (internal quotations omitted). The court looks to the "objective intent," *i.e.*, "the words of the contract," to interpret a contract, not "the subjective intent of one of the

14

parties." *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 135 Cal. Rptr. 2d 505, 514 (Cal. Ct. App. 2003).

Under Delaware law, in construing a contract, "the trial court must consider '[t]he basic business relationship between [the] parties' so that it can 'give sensible life' to the agreement." *Bardy Diagnostics, Inc. v. Hill-Rom, Inc.*, 2021 WL 2886188, at *18 (Del. Ch. July 9, 2021) (quoting *Chi. Bridge & Iron Co. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 926–27 (Del. 2017)) (bracketing in original). Nevertheless, "the background facts cannot be used to alter the language chosen by the parties within the four corners of their agreement." *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 820 (Del. 2018). "Under California law, however, extrinsic evidence may be used to explain the meaning of a contract even if the contract appears unambiguous on its face." *CA, Inc. v. Ingres Corp.*, 2009 WL 4575009, at *29 (Del. Ch. Dec. 7, 2009) (citing *Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*, 442 P.2d 641, 644 (Cal. 1968)), *aff'd*, 8 A.3d 1143 (Del. 2010); *see also* Cal. Civ. Code § 1647 ("A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates.").

## 1. The License Agreement

"When a contract contains a forum selection clause, this court will interpret the forum selection clause in accordance with the law chosen to govern the contract."

*Germaninvestments AG v. Allomet Corp.*, 225 A.3d 316, 331 (Del. 2020) (quoting

*Ashall Homes*, 992 A.2d at 1245) (internal quotations omitted). Because the License

Agreement is governed by California law,[46] the court will interpret the scope of the

Forum Selection Clause under California law. *See id.*

> The Forum Selection Clause in the License Agreement reads, in pertinent part:
>
> Any dispute between the parties regarding this Agreement will be subject to the exclusive venue of the state and federal courts in the state of California in San Francisco, San Mateo and Santa Clara counties. The parties hereby consent to the exclusive jurisdiction and venue of such courts.[47]

Accellion argues that the application of the Forum Selection Clause to any "dispute"

"regarding" the License Agreement must be construed broadly.

Accellion generally points to California decisions applying contractual forum

selection clauses to statutory or tort claims between the contracting parties.[48] In *Cal-*

*State Bus. Prod. & Servs., Inc. v. Ricoh*, 16 Cal. Rptr. 2d 417 (Cal. Ct. App. 1993),

the California Court of Appeal interpreted a forum selection provision written

---

[46] License Agreement § 12.7.

[47] *Id.*

[48] Accellion's briefing relies on a couple of unpublished California Court of Appeals decisions in interpreting the License Agreement. Under the California Rules of Court, however, those unpublished decisions cannot be cited. Cal. R. Ct. 8.1115(a) (requiring that, except under circumstances not present here, "an opinion of a California Court of Appeal or superior court appellate division that is not certified for publication or ordered published must not be cited or relied on by a court or a party in any other action"). Accordingly, this decision does not cite or rely on those opinions.

identically across a group of contracts.  Each provision stated that any state or federal district court in the Borough of Manhattan in New York City would have "exclusive jurisdiction over any case or controversy arising under or in connection with" its respective agreement.  *Id.* at 420 n.6.  The court held that those provisions should be interpreted broadly to "encompass[] all causes of action arising from or relating to [their respective] agreement[s]."[49]  *Id.* at 423 (citations and emphasis omitted); *see also Olinick v. BMG Entm't*, 42 Cal. Rptr. 3d 268, 279 (Cal. Ct. App. 2006) (holding state statutory and common law age discrimination claims fell within an employment agreement's forum selection clause using "arising under" language).

The scope of the Forum Selection Clause turns on the precise language of the agreement.  The Forum Selection Clause applies to "any dispute between the parties regarding this Agreement."  The ordinary meaning of "regarding" is "[i]n reference or relation to," "about," or "concerning."  *Oxford English Dictionary* (3d ed. 2009); *see Merriam-Webster's Collegiate Dictionary* (11th ed. 2014) (defining "regarding" as "with respect to; concerning"); *see also In re McGraw-Hill Glob. Educ. Hldgs.*

_____

[49] *Ricoh* relied on *Nedlloyd Lines B.V. v. Superior Court*, 834 P.2d 1148 (Cal. 1992), which held that a choice of law provision stating that it "governs" the agreement "encompasses all causes of action arising from or related to that agreement, regardless of how they are characterized, including tortious breaches of duties emanating from the agreement or the legal relationships it creates."  *Id*. at 1155.  The *Ricoh* court, observed that choice-of-law and forum selection provisions are "closely related" under California law and extended *Nedlloyd*'s reasoning to forum selection clauses.

17

*LLC*, 909 F.3d 48, 68 (3d Cir. 2018) (relying on same dictionary definitions).[50] Other California decisions support a broad reading of these terms. *See Shepard v. Edward Mackay Enters., Inc.*, 56 Cal. Rptr. 3d 326, 328 (Cal. Ct. App. 2007) (characterizing an arbitration clause as "broadly worded" where it mandated arbitration for any disputes "regarding" or "arising out of" the greater agreement); *Sagonowsky v. More*, 75 Cal. Rptr. 2d 118, 126, 133–34 (Cal. Ct. App. 1998) (finding that arbitration agreement requiring arbitration of "any dispute" "regarding" the parties' agreements was broad and not limited to "colorable" or "bona fide" claims).

Accellion also points to *In re McGraw-Hill Global Education Holdings LLC*, 909 F.3d 48 (3d Cir. 2018), in further support of the proposition that the wording of the Forum Selection Clause favors its broad application. There, in considering a forum selection provision, the court reasoned that "regarding" may be equated with "'relates to'" or "as having some 'logical or causal connection.'" *Id.* at 68 (quoting *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1074 (3d Cir. 1997) (Alito, J.)); *see also Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1047

---

[50] Like Delaware, California courts frequently refer to a dictionary definition to construe contractual terms. *See, e.g.*, *Scheenstra v. Cal. Dairies, Inc.*, 153 Cal. Rptr. 3d 21, 42, 46–47 (Cal. Ct. App. 2013) (utilizing dictionaries to aid in the interpretation of cooperative's bylaws); *Scott v. Cont'l Ins. Co.*, 51 Cal. Rptr. 2d 566, 569 (Cal. Ct. App. 1996) ("In seeking to ascertain the ordinary sense of words, courts in insurance cases regularly turn to general dictionaries.").

(Del. Ch. 2006) (holding that the phrase "relating to" caused a choice-of-law provision to govern not only "contract claims that might arise among the parties," but also "claims in tort seeking rescission" of the agreement). A provision that extends to matters "relating to" an agreement encompasses "any issues that '*touch on* contract rights or contract performance.'" *ASDC Hldgs., LLC v. Richard J. Malouf 2008 All Smiles Grantor Retained Annuity Tr.*, 2011 WL 4552508, at \*5 (Del. Ch. Sept. 14, 2011) (quoting *Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 155 (Del. 2002)).

The aforementioned authorities support a broad reading of the Forum Selection Clause. Plaintiffs do not challenge Accellion's general assertion that the Forum Selection Clause should be interpreted broadly. Nor do they take issue with Accellion's interpretive authority or cite anything to the contrary. Instead, Plaintiffs simply point to the language of the Forum Selection Clause and argue that it does not apply to their claims under the BAA. In the absence of contrary authority I am persuaded that, consistent with the aforementioned authority, the Forum Selection Clause extends to any disputes that are related to or have any logical or causal connection to the License Agreement.

19

## 2.     The BAA's Integration Clause

To avoid the Forum Selection Clause in the License Agreement, Plaintiffs rely on the Integration Clause in the BAA.[51]  The integration clause in the BAA states:

> This Agreement—consisting of the signature page, these terms and conditions and the attached Schedules and Addenda—constitute the entire agreement between the Parties with respect to its subject matter and merges, integrates and supersedes all prior and contemporaneous agreements, addenda and understandings between the Parties, whether written (including within any Health Net-Vendor Contract(s)) or oral, concerning its subject matter.  Schedules A and B to this Agreement, attached hereto, are incorporated herein as though fully set forth in the body of the Agreement.[52]

The BAA contains neither a forum selection clause nor a choice of law provision.  Plaintiffs argue the logical inference from this omission is that the parties considered the issue, chose not to include any such provisions, and therefore intended that claims concerning the BAA could be brought in any court that could obtain personal and subject matter jurisdiction.[53]

---

[51] *See* Hrg. 25:12–23, 27:22–28:1 ("you have an agreement, and then you have a subsequent agreement on a specific subject matter . . . that supersedes the overlapping areas").

[52] BAA § X.

[53] Hrg. 26:10–12 ("I think that, under those circumstances, there was a choice not to include the choice of law provision."), 28:5–15 ("It allows us to sue in other places where we want to. . . .  And that's fully consistent . . . with the agreement signed by the parties. . . . [T]hese were sophisticated parties . . . .  They have the ability to adjust and amend those contracts.").

Plaintiffs principally draw support for their position from two cases. In *Newport Disc, Inc. v. Newport Electronics, Inc.*, 2013 WL 987936 (Del. Super. Ct. Mar. 11, 2013), the two defendant corporations were sold pursuant to a purchase agreement that contained a New York forum selection clause. Less than two months later, the defendants entered into agreements with one of the plaintiff corporations that terminated commission agreements which pre-dated the purchase agreement. The termination agreements did not contain forum selection clauses, but did include integration clauses and New York choice-of-law provisions.[54] The plaintiffs later filed an action in Delaware, alleging that the defendants breached the termination agreements. The defendants moved to dismiss, invoking the provision of the purchase agreement that selected New York courts as the exclusive forum "for the purpose of any Action arising out of or relating to [the] Agreement."[55] Defendants argued the provision was enforceable, and the suit was improperly brought in Delaware, because the termination agreements were "part and parcel" with and incorporated by reference the purchase agreement. *Id.* at \*2.

---

[54] The identical integration clauses read: "This Termination Agreement contains the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements, written or oral, among the parties identified above with respect thereto." *Newport Disc*, 2013 WL 987936, at \*1.

[55] *Id.* at \*1. "Action" was defined as "any suit, litigation, hearing, examination, inquiry, investigation, audit, arbitration, cause of action, claim, complaint, criminal prosecution, governmental or other administrative proceeding, whether at law or at equity, before or by any Court or Governmental Authority, arbitrator or other tribunal." *Id.* at \*1 n.1.

21

The *Newport Disc* court, denied the motion to dismiss. The court relied primarily upon the integration clauses in the termination agreements and the plaintiffs' *prima facie* showing that the action could be resolved solely by reference to the termination agreements. *Id.* at *5.[56] The court stated: "Absent a clear intention to the contrary, an integration clause should be interpreted to limit the forum selection clause to the agreement containing the forum selection clause." *Id.* at *4. The court was also influenced by the fact that the termination agreements "specifically provide[d] choice of law provisions," which "suggest[ed] the parties' choice not to incorporate other provisions, such as forum selection, from the Purchase Agreement." *Id.* at *2. Therefore, the court determined that the forum selection clause in the purchase agreement was inapplicable to the parties' dispute.

Plaintiffs also rely upon *Green Isle Partners, Ltd. v. Ritz-Carlton Hotel Co. L.L.C.*, 2000 WL 1788655 (Del. Ch. Nov. 29, 2000). In that case, plaintiff, Green Isle, owned a hotel and leased the surrounding property outside of San Juan, Puerto Rico. *Id.* at *1. The defendant, Ritz-Carlton, operated the hotel pursuant to an operating agreement between it and Green Isle. *Id.* The operating agreement was fully integrated and governed by Georgia law; it did not contain a forum selection

---

[56] Both the purchase agreement and termination agreements in *Newport Disc* were governed by New York law. The parties in that case agreed there was "no material difference between New York and Delaware law" for the purposes of the motion before the court. *Id.* at *2 n.8.

provision. *Id.* at *1, *4. Four days after entering into the operating agreement, Ritz-Carlton, Green Isle, and the guarantor of the hotel project entered into an attornment agreement, establishing the rights and obligations of Ritz-Carlton and the guarantor in the event of Green Isle's default under its loan obligations or the operating agreement. The attornment agreement was governed by Puerto Rican law, and it selected Puerto Rico as the exclusive forum for "all actions or proceedings . . . arising out of or from or related to th[e] agreement. *Id.* at *2.[57]

When Green Isle was unable to pay its debt service on the bonds and the loan guaranty was called, the guarantor served Green Isle with a notice of default of its debt obligation. Green Isle then filed an action in Delaware to inspect books and records of Ritz-Carlton under the operating agreement. Ritz-Carlton moved to dismiss, citing the clause in the attornment agreement that selected Puerto Rico as the exclusive forum for any action or proceeding arising out of or relating to that agreement. *Id.* at *2.

In denying the motion to dismiss, the court reasoned that the subject matter of the parties' dispute was confined to the operating agreement. Thus, the agreement's integration clause made the provisions in the operating agreement addressing a

---

[57] The forum selection provision read, in part: "all actions or proceedings in any way, manner or respect, arising out of or from or related to this Agreement shall be litigated in courts having situs within the Commonwealth of Puerto Rico." *Green Isle*, 2000 WL 1788655, at *2.

books and records inspection the "entire agreement between the parties" regarding that subject matter. *Id.* at *4. Underlying the court's reasoning was the nature of the parties' various agreements, and particularly the limited scope of the attornment agreement as applied to Green Isle. "Critical" to the court's analysis was the fact that Green Isle had signed the attornment agreement for "the sole purpose of consenting to the covenants made therein between [the guarantor] and Ritz-Carlton." *Id.* at *3. "Green Isle never became substantively bound to any obligations or duties created by [the attornment agreement], including its forum selection clause." *Id.* at *4. The court also concluded that the suit did not arise out of or relate in any way to the attornment agreement, rejecting the defendant's entirely speculative argument as to what Green Isle might do as a result of its inspection. *Id.* at *5.

The BAA's integration clause is not dispositive of the present motion. There is no *per se* rule that a forum selection clause in a prior agreement is superseded by a subsequent, integrated agreement that is silent as to a choice of forum. This court has also confronted the issue directly and held that the existence of an integration clause in a later-executed ancillary contract did not avoid application of the forum selection provision in the prior contract. Both of the following cases are instructive.

In *CA, Inc. v. Ingres Corp.*, 2009 WL 4575009, CA spun off Ingres as an independent software company. To accommodate the remaining CA customers who would continue using software now controlled by Ingres, the parties entered into a

"Legacy Support Agreement," which provided for Ingres to maintain and support the software for CA's customers. *Id.* *6–9. The Legacy Support Agreement was governed by New York law and selected the courts of New York and Delaware as the exclusive forum for "any action or proceeding in respect of any claim directly arising out of or related to" that agreement. *Id.* at *46. Two years later, the parties entered into a "Reseller Agreement," which permitted CA to purchase discounted licenses for the latest versions of its legacy software for its customers, after Ingres refused to provide those customers with the software for free as part of the Legacy Support Agreement. *Id.* at *10–15. The Reseller Agreement contained an integration clause, was governed by California law, and did not have a forum selection clause. *Id.* at *31, *46. One issue in *Ingres* was whether Ingres should be enjoined from prosecuting claims in California, which according to CA, implicated the forum selection clause in the Legacy Support Agreement. *Id.* at *20, *46.

Chief Justice, then-Vice Chancellor, Strine held in a post-trial opinion that claims under the Reseller Agreement in California were subject to the forum selection clause in the Legacy Support Agreement. The court found that the Reseller Agreement's "plain terms d[id] not reveal where it beg[an] and the Legacy Support Agreement end[ed]." *Id.* at *47. The court further found that the Reseller Agreement acted as a "gap-filler" for the Legacy Support Agreement, modifying the parties' preexisting obligations. *Id.* The court was also influenced by the "complex

25

relationship" between the parties and the necessity of considering the parties' "broader network of contracts." *Id.* As the Delaware Supreme Court observed in its affirmance, "the court must consider the entire collection of related contracts, including those that contained forum selection clauses . . . . After considering and interpreting all of the related agreements, the Court of Chancery concluded that the agreement that did not contain a forum selection clause did not supersede those that did." 8 A.3d at 1146.

More recently, in *Florida Chemical Co., LLC v. Flotek Industries, Inc.*, 262 A.3d 1066 (Del. Ch. 2021), the court held that a party could not avoid a forum selection provision in one contract merely because the other agreement, which did not possess a forum selection clause, contained an integration clause. Although a literal reading of the integration clause would eliminate the Delaware forum selection clause in the first agreement, "[s]uch a literal reading [was] not tenable." *Id.* at 1081. The court viewed the contracts "realistically as part of the real-world business context" and concluded they were executed contemporaneously to effectuate the entire transaction. *Id.* at 1081–82. The court cited the trial court opinion in *Ingres* for the proposition that "a forum selection provision in the more 'fundamental' agreement applied to an ancillary agreement that did not contain a forum selection provision, despite an integration clause in the ancillary agreement." *Id.* at 1082.

26

Plaintiffs attempt to distinguish *Ingres*, arguing that the agreements at issue in that case were found to be "so deeply intertwined that 'the 2007 Reseller Agreement's plain terms do not reveal where it begins and the Legacy Support Agreement ends.'"[58] Plaintiffs argue that the BAA and License Agreement are not so intertwined and cover completely different subject matters.[59] Plaintiffs further argue that *Ingres* is irrelevant because the BAA contains the Integration Clause stating that it supersedes all prior agreements.[60]

Plaintiffs ignore, however, that the Reseller Agreement in *Ingres* also contained an integration clause stating that it superseded all prior agreements pertaining to the subject matter. *See Ingres*, 2009 WL 4575009, at *17. Indeed, the court concluded that it did supersede the Legacy Support Agreement as to its subject matter. *Id.* at *33 ("I conclude that the 2007 Reseller Agreement supersedes the Legacy Support Agreement in regard to Legacy Customers' ability to obtain licenses to OpenROAD 2006."). But the court ultimately concluded that the forum selection clause in the earlier executed Legacy Support Agreement applied to claims under the Reseller Agreement. *Id.* at *47 ("Therefore, I conclude that the 2007 Reseller

---

[58] Dkt. 7 ("Pls.' Ans. Br.") at 17 (quoting *Ingres*, 2009 WL 4575009, at *47).

[59] *Id.*

[60] *Id.*

Agreement does not supersede the Legacy Support Agreement's forum selection clause.").

Both *Ingres* and *Flotek* acknowledge that the existence of an integration clause in a later-executed contract does not *per se* displace a forum selection clause in an earlier executed contract between the parties. I find this case to be sufficiently distinguishable from both *Green Isle* and *Newport Disc*. In *Green Isle*, unlike here, the plaintiff was not substantively bound to the contract containing the forum selection clause. *Green Isle*, 2000 WL 1788655, at *4. Here, there is no dispute that Heath Net signed the License Agreement and is bound to all of its terms. Second, as discussed below, the relationship between the claims in this case and the License Agreement is not based upon hypothetical suggestions.

The *Newport Disc* court found that the parties' inclusion of a choice-of-law provision and omission of a choice-of-forum provision suggested that the parties thought about both issues and chose not to include a forum selection clause. The facts of this case, however, lead me to a different conclusion. The BAA contains neither a choice of forum nor a choice of law provision. "When two sophisticated, commercial entities agree to a choice-of-law clause like the one in [the License Agreement], the most reasonable interpretation of their actions is that they intended for the clause to apply to all causes of action arising from or related to their contract." *Nedlloyd Lines B.V. v. Superior Ct.*, 834 P.2d 1148, 1153 (Cal. 1992). I am thus of

28

the same view as the *Olinick* court, and "seriously doubt" that two, sophisticated parties "would intend 'that the laws of multiple jurisdictions would apply to a single controversy having its origin in a single, contract-based relationship'" in the BAA and that the parties could file suit wherever they might be able to obtain personal jurisdiction over the other party. *Olinick*, 42 Cal. Rptr. 3d at 279 (quoting *Nedlloyd Lines*, 834 P.2d at 1154). The Plaintiffs' own words confirm that conclusion.

The Plaintiffs' verified allegations acknowledge that the BAA is part of the License Agreement, which gives Plaintiffs the right to access the FTA.[61] As the Plaintiffs allege: "This case arises out of the January 2021 breach of Accellion's . . . [FTA]."[62] The Complaint alleges that "Accellion marketed the FTA system as a solution for companies who need to 'transfer large and sensitive files securely.' Indeed, Accellion routinely touted its system as a way for companies to securely protect PHI and to comply with . . . [HIPAA]."[63] Thus, protection of PHI and compliance with HIPAA were contemplated at the time the parties entered into the License Agreement in 2012. That agreement is the contract that gives Plaintiffs rights to use the FTA.[64]

---

[61] License Agreement § 4.1.

[62] Compl. ¶ 4.

[63] *Id.* ¶ 14.

[64] License Agreement § 4.1.

Three years later, Health Net insisted on entry into the BAA as a condition to renewal of the License Agreement.[65] During the parties' negotiations, "Health Net made clear—and Accellion agreed—that *the BAA would be 'part of the contract'* governing Health Net's access to, and use of, Accellion's FTA system."[66] Following almost two months of negotiations between these two sophisticated parties, "**Health Net And Accellion Enter[ed] Into The BAA And Incorporate[d] The BAA Into Their Contracting Agreement.**"[67] Accellion points out, and Plaintiffs do not deny, that the only contract that governed the parties relationship as of the date of the BAA was the License Agreement.[68]

The BAA expressly contemplated that at or shortly after the parties entered into the BAA, the parties would also be entering into a Health Net - Vendor Contract "for the provision of services, software or some other business arrangement."[69] The

---

[65] Compl. ¶ 19 ("Accellion initially resisted signing the BAA. Accellion relented, however, after Health Net told Accellion that Health Net would not renew its FTA licensing agreement if Accellion did not enter into the BAA. Health Net and Accellion then negotiated the terms of the BAA over the course of nearly two months . . . .").

[66] *Id.* (emphasis added).

[67] *Id.* at 5 (emphasis in original).

[68] Dkt. 8 ("Def.'s Reply Br.") at 6–7. The parties continue to operate under the License Agreement. At oral argument, counsel for Accellion represented that "Accellion has licensed FTA to Centene since 2012, pursuant to a comprehensive license agreement." Hrg. 4:9–11. Counsel for Plaintiffs did not deny this representation.

[69] BAA, Recital A.

Plaintiffs contend that the License Agreement is a Health Net - Vendor Contract.[70] Accellion disputes that contention.[71] This, in my view, represents a "dispute between the parties regarding [the License] Agreement."[72]

The BAA does not entirely replace the License Agreement. Instead, it is part of the broader contractual relationship between the parties.[73] As in *Ingres*, the Plaintiffs' claims at least "relate" to the License Agreement. One issue will be whether the License Agreement is a Health Net - Vendor Contract under the BAA such that the "exclusions and limits of liability, if any, provided in the [License Agreement] shall not apply . . . ."[74] Plaintiffs contend the License Agreement is a Health Net - Vendor Contract;[75] Accellion maintains that it is not.[76] There is a

---

[70] *See* Hrg. 22, 27.

[71] *Id.* at 39.

[72] License Agreement § 12.7.

[73] In its Reply Brief, Accellion argues that the BAA was "merged into" the License Agreement. Def.'s Reply Br. 6, 8, 9. Accellion cites no legal authority to support the concept that the BAA and License Agreement are one agreement for all purposes. The argument that the BAA was "merged into" the License Agreement was not raised in Accellion's opening brief and is therefore waived. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Emerald Partners has waived any argument it had against Hall Financial by not raising the issues in their opening brief").

[74] BAA § II(q).

[75] Hrg. 22:5–7 ("And [the Integration Clause] calls out the Health Net vendor contracts, which would be the license agreement."), 27:6–9 ("THE COURT: Is the license agreement a form of vendor contract that's referred to in the BAA? [Counsel for Plaintiffs]: Yeah, I believe it is, Your Honor.").

[76] *Id.* at 39:4–6 ("We would dispute that the license agreement is a vendor contract within the meaning of the BAA.").

genuine dispute as to whether the indemnity provision in the BAA supersedes the indemnity provision in the License Agreement. I need not and do not decide that issue here.

My decision should not be read to hold that the mere absence of choice-of-law and forum selection provisions in the BAA, standing alone, conclusively establishes that the License Agreement controls. Instead, it is another factor that leads me to conclude, looking at the real-world business context in which the BAA was negotiated and drafted, as alleged in the Complaint, that the parties intended the License Agreement's Forum Selection Clause to govern the BAA. The only reasonable inference to be drawn from the Complaint and the parties' submissions is that the BAA was negotiated and executed in conjunction with the renewal of the License Agreement.

### B. Accellion's Defenses Rely on the License Agreement

Separately, Accellion argues that the Forum Selection Clause applies to Plaintiffs' claims because Accellion's defense to the claims concerning the Data Breach will rely on provisions of the License Agreement. Specifically, Accellion contends that it will assert the limitation of liability, indemnification, and defects in software provisions of the License Agreement in defense of Plaintiffs' claims.[77]

---

[77] Hrg. 17; License Agreement §§ 8.4 (defects in software disclaimer), 9 (indemnification), 10 (limitation of liability). Accellion has not indicated that it intends to use these

Accellion points to several cases for the proposition that defenses based on a related contract that contains a forum selection clause will subject a plaintiff's claims to the chosen forum.[78]

Defendant relies heavily upon *In re McGraw-Hill Global Education Holdings, LLC*, 909 F.3d 48 (3d Cir. 2018). In that case, two photographers entered into agreements with an agency that permitted the agency to sub-license the photographers' work to third parties. The agreements were governed by New York law and selected New York as the exclusive venue for "any action arising out of th[e] Agreement." *Id.* at 53. The agency, acting within its contractual authority, sub-licensed the photographers' works to a publisher. The sub-license agreements were also governed by New York law and selected the courts of New York as the forum for "[a]ny dispute regarding th[e] Agreement." *Id.* The photographers did not sign the sub-license agreements. The photographers filed separate actions against the publisher in the Eastern District of Pennsylvania, alleging that the publisher used their photos beyond the scope of the licensure agreements, in violation of federal copyright law. The publisher filed motions to transfer the actions to New York, citing the forum selection clause in the sub-license agreement between

provisions to defend against Plaintiffs' claims to the extent they invoke a breach of the Audit Provision.

[78] Pl.'s Op. Br. 14–15.

it and the agency. The cases were assigned to separate trial court judges, who reached opposite conclusions.[79]

The Third Circuit held the copyright claims fell within the scope of the forum selection clause in the sublicense agreement, which selected New York courts as the exclusive forum for "[a]ny dispute regarding th[e] Agreement." *McGraw-Hill*, 909 F.3d at 67. The court concluded the forum selection clause was "broad enough to encompass actions in which the agreements are raised as an affirmative defense" to the copyright claims for two reasons. *Id.* at 68. First, the allegations on the face of the complaints cited the license agreements, said the licenses were for limited use, and that the publisher printed or distributed more copies than authorized. *Id.* Second, the forum selection clause specified federal copyright law as a source of law governing any dispute. *Id.*

Similarly, in *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070 (3d Cir. 1997), Justice, then-Circuit Judge Alito, considered a forum selection clause extending to "any dispute arising under or out of or in relation to" the agreement.

---

[79] The Third Circuit concluded that the photographers were not subject to the forum selection clause in the sublicense agreement between the agency and the publisher. Nevertheless, the court held that the trial judge who transferred the case to New York did so erroneously, but the error was not clear and indisputable so as to warrant mandamus. Judge Roth, dissenting in part, opined that mandamus was warranted and that both photographers—asserting the very same claims and represented by the same lawyer—should have been treated equally and permitted to litigate in the forum of their choosing. *McGraw-Hill*, 909 F.3d at 71–72 (Roth, J., dissenting in part and concurring in part).

34

*Id.* at 1072. In an opinion affirming the trial court, he wrote that this language "easily encompasses a dispute in which the [agreement containing that clause] is raised as a defense." *Id.* at 1076; *see also Zaitzeff v. Peregrine Fin. Grp., Inc.*, 2008 WL 11408422, at *8 (C.D. Cal. June 23, 2008) (citing *John Wyeth* for the proposition that "a claim may fall within the scope of a forum selection clause even if it is related only to a defense"). In reaching this conclusion, Justice Alito determined that the forum selection clause applied more broadly to disputes than it would to claims. *John Wyeth*, 119 F.3d at 1074; *see also McGraw-Hill*, 909 F.3d at 67 ("Under *Wyeth*, this Court construes the word 'dispute' as being broader than 'claim.'"). Accellion also points to the court's dismissal of tort claims in *Ashall Homes*, where the defendant argued that its defense would be based on provisions of a contract containing a forum selection clause. The court granted the motion to dismiss, observing that "[r]esolution of these claims [would] require an analysis of the [agreement containing the forum selection clause]." 992 A.2d at 1253.

Plaintiffs reject Accellion's argument on the grounds that it "is not the law in Delaware, and Accellion notably cites no Delaware cases in support."[80] But the only authority that Plaintiffs cite is *Newport Disc*, where the court observed that the defendants "were unable to point to any authority supporting the proposition that

---

[80] Pls.' Ans. Br. 20.

either defenses or counter-claims, which are based on a related contract, can divest Plaintiffs of their chosen forum." 2013 WL 987936, at *5. The problem for Plaintiffs, though, is twofold. First, they have not offered any argument or cited any authority for the proposition that Delaware law governs the BAA. More important, however, is that unlike in *Newport Disc* (the only authority Plaintiffs cite for this issue), the Defendant here has cited authority supporting its position that affirmative defenses relying on provisions of another agreement between the parties is sufficient to subject the claims to the forum selection provision in the related agreement.[81] Plaintiffs do not address any of those cases, which I find persuasive.

Finally, Plaintiffs contend that Accellion should not be permitted to invoke the Forum Selection Clause to a defense that is "obviously frivolous."[82] But the License Agreement extends to any "dispute between the parties regarding" the License Agreement. The BAA did not entirely supersede the License Agreement. That would be an unreasonable construction of the BAA, which says nothing about the terms of Plaintiffs' license of Accellion's software (including payment terms) or access to the FTA. The Integration Clause in the BAA is limited to the "subject matter" of the BAA. Both contracts must thus co-exist. The parties did not limit the

---

[81] *See McGraw-Hill*, 909 F.3d 48; *John Wyeth*, 119 F.3d 1070; *see also Zaitzeff*, 2008 WL 11408422.

[82] Pls.' Ans. Br. 22.

36

scope of the Forum Selection Clause to meritorious disputes. *See Sagonowsky v. More*, 75 Cal. Rptr. 2d 118 (Cal. Ct. App. 1998) ("Appellants urge us to insert into the agreement to arbitrate any dispute the added requirement that the dispute be a 'colorable claim' or a '*bona fide*' claim. We decline to rewrite the agreement entered into by the parties.").

I conclude that Plaintiffs' claims for breach, a declaration concerning the scope, and for specific performance of the BAA are subject to the Forum Selection Clause in the License Agreement. That provision must be enforced unless doing so "would be unreasonable and unjust, or that the clause is invalid for such reasons as fraud and overreaching." *See Ingres*, 8 A.3d at 1146 (internal quotations and bracketing omitted). Plaintiffs make no such argument here. Therefore, Plaintiffs' claims are subject to the Forum Selection Clause of the License Agreement.

## III. CONCLUSION

The Plaintiffs' claims are subject to the Forum Selection Clause of the License Agreement, which provides that any dispute between the parties regarding that agreement must be heard in the state or federal courts located in the counties of San Francisco, San Mateo, or Santa Clara California. Accordingly, this court is an improper venue, and Accellion's motion to dismiss is **GRANTED**.

37